[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12966

_____

ODETTE BLANCO DE FERNANDEZ,
a.k.a. Blanco Rosell,
EMMA RUTH BLANCO,
in her personal capacity, and as
Personal Representative of the
Estate of Alfredo Blanco Rosell, Jr.,
HEBE BLANCO MIYARES,
in her personal capacity, and as
Personal Representative of the
Estate of Byron Blanco Rosell,
SERGIO BLANCO DE LA TORRE,
in his personal capacity, and as
Administrator Ad Litem of the
Estate of Enrique Blanco Rosell,
EDUARDO BLANCO DE LA TORRE,

 as Administrator Ad Litem of the
Estate of Florentino Blanco Rosell,
LIANA MARIA BLANCO,
SUSANNAH VALENTINA BLANCO,
LYDIA BLANCO BONAFONTE,
JACQUELINE M. DELGADO,
BYRON DIAZ BLANCO, JR.,
MAGDELENA BLANCO MONTOTO,
FLORENTINO BLANCO DE LA TORRE,
JOSEPH E. BUSHMAN,
CARLOS BLANCO DE LA TORRE,
GUILLERMO BLANCO DE LA TORRE,

Plaintiffs-Appellants,

*versus*

SEABOARD MARINE LTD.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-25176-BB

_____

Before JORDAN, BRASHER, and ABUDU, Circuit Judges.

BRASHER, Circuit Judge:

In 1996, Congress enacted the Cuban Liberty and Democratic Solidarity Act—known as the Helms-Burton Act—to provide U.S. nationals with a way to regain losses they suffered when the Castro regime came to power in Cuba and confiscated their property. The Act provides a private right of action for those U.S. nationals against anyone who knowingly "traffics" in property the Castro regime confiscated from them.

Odette Blanco de Fernandez and her four siblings' heirs and estates alleged that Seaboard Marine trafficked in property that the Castro regime confiscated from their family's companies—Azucarera Mariel, S.A. and Maritima Mariel, S.A.—when it shipped goods to a container terminal on the west side of Mariel Bay. The district court granted summary judgment for Seaboard because, among other things, it concluded that Fernandez failed to present any evidence that Seaboard trafficked in confiscated land.

We agree with the district court that Seaboard did not traffic in any property confiscated from Maritima, but we disagree that Fernandez did not provide sufficient evidence to support a finding that Seaboard trafficked in property confiscated from Azucarera. Accordingly, we affirm in part and reverse in part.

## I.

### A.

Odette Blanco de Fernandez and her four siblings each held a twenty percent ownership stake in two of their family's

companies—Azucarera Mariel, S.A. and Maritima Mariel, S.A.—that owned property in and around the Mariel Bay in Cuba. After the Castro regime came to power in 1959, it confiscated all the property that the family owned. The confiscation decree explained that the government had investigated Fernandez and her siblings and that it would "confiscate in favor of the Cuban State the shares" Fernandez and her siblings owned in Azucarera Mariel and Maritima Mariel along with "all the entities' properties, rights, and actions." Soon after, Fernandez and her siblings fled Cuba and became U.S. citizens. Fernandez's siblings passed away after March 12, 1996, and before this lawsuit was filed.

Before the Cuban revolution, Azucarera bought thousands of acres on the west side of Mariel Bay on and around the Angosta Peninsula. The pre-Castro Cuban government built a naval air station on that peninsula, and Azucarera's real property abutted that air station. The illustration below depicts the Cuban government's pre-Castro land holding as the shaded area on the peninsula:



In 2014, the Cuban government opened a container terminal on the naval air station site. Fernandez and the other plaintiffs say that the container terminal extends beyond the former naval air station and partially sits on land that the Castro regime confiscated from Azucarera. Indeed, the plaintiffs' international mapping expert reported that "it is reasonable to conclude that" Azucarera owned land in "areas situated both north and south of the naval air station[.]"Fernandez produced maps from the Cuban government that show the container terminal extends onto that same land.

For its part, Maritima owned port facilities on the eastern side of the bay in a town known as Punta Coco Solo. That ownership arose out of Fernandez's family's acquisition of a company called Central San Ramon in 1949. The Cuban government granted Central San Ramon a concession in a 1934 decree to privately use the docks and warehouses "on the coast of the Port of Mariel, a place known as Punta Coco Solo[.]"

In a 1955 decree, the Cuban government approved Maritima's request to build additional facilities in Mariel Bay with government financing. The operative part of the decree provides a "concession" "for the construction of new buildings and works, without detriment to the vested rights of third parties and entities by virtue of previous and concurrent concessions[.]" The several "whereas" clauses of the decree explain that Maritima proposed to build "walls, docks, warehouses, dredging, fillings-in, and others in low lands and mangroves of its property, and in the maritime-terrestrial zone of the littoral adjacent to" land that Maritima owned

"in the north coast of the province of Pinar del Rio[.]" These clauses explain that Maritima sought "to convert to public use the dock and warehouse located on the land of its property" that was "legalized and authorized for private use" by the 1934 decree. The decree also established deadlines for Maritima to complete the project, provided government financing, and set parameters for how Maritima would operate the port facilities once completed. The concession was to last for seventy years. Fernandez and the other plaintiffs say that the concession granted Maritima the exclusive right to build and use docks for shipping in the bay, subject only to preexisting concession holders.

Seaboard began shipping frozen chicken to Cuba through the Bay of Mariel in 2019. To do so, Seaboard docks its vessels at the container terminal on the old naval base on the Angosta peninsula on the west side of Mariel Bay. A Cuban entity called Terminal de Contenedores de Mariel, S.A., or TCM, manages the Terminal. Seaboard contracts with TCM and another Cuban entity called Agencia Maritima Taina, S.A., for various services related to unloading its shipments and arranging for transportation inland.

*B.*

The Helms-Burton Act created a private right of action for U.S. nationals who own claims to property confiscated by the Castro regime against any person who "traffics" in that property. *See* 22 U.S.C. § 6082(a). Fernandez and her siblings' heirs and estates sent Seaboard a letter in September 2020 that notified Seaboard it was trafficking in confiscated property under the Act by delivering

chicken to the terminal on the old navy base. Seaboard did not cease its shipping activities after receiving that letter.

Fernandez and her siblings' heirs and estates sued Seaboard. The plaintiffs claim that Seaboard unlawfully used confiscated property in two ways. First, they claim that its deliveries to the container terminal violated Maritima's exclusive right to exploit commercial docks in the bay. Second, they claim that the deliveries trafficked in Azucarera's real estate because the terminal on the old navy base was built, in part, on real property that the Castro government confiscated from Azucarera and because the two entities Seaboard contracted with (TCM and Taina) transported Seaboard's goods across confiscated land.

The district court dismissed the siblings' heirs and estates, concluding that they could not bring a claim under the Act because the siblings died after March 12, 1996, and therefore the heirs and estates "acquired" their claims after the statutory bar date. But it held that Fernandez's claims against Seaboard could proceed.

Seaboard later moved for summary judgment. Among other things, it argued that (1) Fernandez did not own property confiscated by the Cuban government because her companies, not Fernandez herself, owned the confiscated property, and (2) Seaboard did not traffic in any confiscated property by delivering chicken to the terminal on the old navy base.

The district court granted Seaboard's motion for summary judgment. It held that Fernandez could sue because she owned shares in Maritima and Azucarera, which owned the property

confiscated by the Castro regime. But the district court held that there was no genuine dispute of material fact that Seaboard had not "trafficked" in any confiscated property for three reasons. First, it determined that Maritima's 1955 concession did not give it the exclusive right to exploit the entirety of the bay. Second, as for the claims about Azucarera's confiscated real estate, the district court held that Azucarera likely owned a portion of the land that the container terminal was built on. But Fernandez presented no evidence that Seaboard trafficked in that specific confiscated land. And third, the district court rejected Fernandez's argument that Seaboard trafficked in Azucarera land because Taina and TCM used Azucarera land in storing and transporting Seaboard's goods. *See* § 6023(13)(A)(iii).

This appeal followed.

## II.

We review *de novo* a district court's grant of summary judgment. *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1333 (11th Cir. 2022). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although we draw "all justifiable inferences . . . in favor of the nonmoving party, inferences based upon speculation are not reasonable." *Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) (citation omitted). Thus, a nonmoving party must present more than "[e]vidence that is merely colorable, or is not significantly probative" or "a mere scintilla of evidence" to support their

claims to survive a motion for summary judgment. *Id.* (citation and quotation marks omitted).

## III.

Congress enacted the Helms-Burton Act in 1996 "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." 22 U.S.C. § 6022(6). Title III of the Act provides a private right of action for U.S. nationals against anyone who "traffics" in that confiscated property. *See id.* § 6082(a)(1)(A). A person "traffics" in confiscated property under the Act if, without the authorization of the U.S. national, he or she knowingly and intentionally: (i) "sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property"; (ii) "engages in a commercial activity using or otherwise benefiting from confiscated property"; or (iii) "causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person." *Id.* § 6023(13)(A).

As shareholders in Maritima and Azucarera, Fernandez and the other plaintiffs argue that Seaboard's chicken deliveries to Cuba trafficked in their confiscated property in three ways. First, they argue that Seaboard's deliveries to the old navy base violated Maritima's exclusive right to exploit commercial docks in the bay. Second, they argue that the deliveries trafficked in Azucarera's real

estate because the terminal on the old navy base was built, in part, on real property that the Castro government confiscated from Azucarera. Third, they argue that Seaboard benefited commercially from Azucarera's seized real estate because Seaboard's Cuban contractors used that land to unload Seaboard's goods and transport them into Cuba's interior. We consider whether Fernandez and her siblings' heirs and estates can bring a claim and address each theory of liability in turn.

*A.*

First, we must consider whether the district court properly dismissed the siblings' estates and heirs as plaintiffs in this action. Our recent holding in *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 930 (11th Cir. 2023), resolves the matter. Because the heirs and estates inherited the claims after the statutory bar date, they cannot bring a claim under the Act.

The Helms-Burton Act provides that "a United States national may not bring an action . . . on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996." 22 U.S.C. § 6082(a)(4)(B). In *Garcia-Bengochea*, we held that individuals who inherited an interest in confiscated property after the cutoff date are barred from bringing a claim under the Act. 57 F.4th at 930–31. As part of our decision, we adopted the Fifth Circuit's analysis that the ordinary meaning of "acquires" is to "gain possession or control of; to get or obtain," which includes inheritance. *Id.* (quoting *Glen v. Am. Airlines, Inc.*, 7 F.4th 331,

336 (5th Cir. 2021)). Our precedent is directly on point and controls our analysis here.

The estates argue that our decision in *Garcia-Bengochea* may prevent the heirs from bringing a claim but not the estates. They contend that under Florida law the creation of an estate does not confer ownership on the estate's personal representatives. Therefore, the claim still belongs to the deceased siblings who acquired it before the statutory bar. We disagree. In *Garcia-Bengochea*, we did not consider any state law dimensions to the issue and asked only whether the person bringing the suit had acquired the property before March 12, 1996. *Id.* In doing so, we cited to our unpublished decision in *Gonzalez v. Amazon.com, Inc.*, 835 F. App'x 1011, 1012 (11th Cir. 2021) for the proposition that "[a] U.S. national whose property was confiscated before March 12, 1996, cannot recover damages for another person's unlawful trafficking of that property unless 'such national'—i.e., *the specific person bringing suit*—acquired the claim to the property before March 12, 1996." *Id.* at 931 (emphasis added). Under this principle, only the siblings—who acquired the claim before the deadline—can commence the action, not their estate representatives—who acquired it after the deadline. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989) ("We start . . . with the general assumption that in the absence of a plain indication to the contrary, . . . Congress when it enacts a statute is not making the application of the federal act dependent on state law.") (internal quotation marks and citation omitted).

But even if we look to Florida law, we reach the same conclusion. To establish that an individual retains property interests after death, the estate relies on a single provision of Florida law that defines the "estate" as "the property of a decedent that is the subject of administration." Fla. Stat. § 731.201(14). But other provisions of Florida law suggest the opposite. *See* Fla. Stat. § 732.514 ("The death of the testator is the event that vests the right to devises unless the testator in the will has provided that some other event must happen before a devise vests."); Fla. Stat. § 732.101(2) ("The decedent's death is the event that vests the heirs' right to the decedent's intestate property."). And Florida case law confirms that the estate acquires an interest in the property after the decedent dies. *See Depriest v. Greeson*, 213 So. 3d 1022, 1025 (Fla. 1st DCA 2017) ("[W]e do not agree that the estate had no legal ownership interest in Decedent's car."); *Sharps v. Sharps*, 214 So. 2d 492, 495 (Fla. 3d DCA 1968) ("Upon [the husband's] death, in the twinkling of a legal eye, that check became an asset of the husband's estate."). Even if the estates do not obtain a full ownership interest in the claim, they obtain their interests only upon the death of the descendants. Therefore, the estates acquired an interest in the claim only after the deadline and cannot bring this action.

In a last-ditch effort to escape this conclusion, the estates argue that they should be able to bring their claims as a matter of policy. They insist that the purpose of the bar date was to prevent foreigners from transferring claims to U.S. nationals, and that interpreting "acquire" broadly would mean that the Act will eventually have no effect. We rejected similar arguments in *Garcia-*

*Bengochea* and explained that if Congress intended to narrow the meaning of "acquire" it knew how to do so. 57 F.4th at 931. The statute is clear, and "policy arguments cannot supersede the clear statutory text." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 192 (2016). Because the estates and heirs acquired the claim after the deadline, they cannot bring this action.

*B.*

Next, we must consider whether shareholders can assert claims under the Act based on the confiscation of corporate property, and if so, whether Fernandez had presented sufficient evidence to create a genuine dispute of material fact that she was a shareholder of Maritima and Azucarera. As explained below, we determine that shareholders can bring claims and that Fernandez sufficiently demonstrated that she was a shareholder.

To start, Title III of the Act creates a private right of action for "any United States national who owns the *claim* to such property" confiscated by the Cuban government. 22 U.S.C. § 6082(a)(1)(A) (emphasis added). The Act further defines "property" as "any property . . . whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein[.]" *Id*. § 6023(12)(A). Seaboard argues that Fernandez cannot bring a claim because Maritima and Azucarera owned the property at issue, rather than the shareholders. But this reading would require us to remove the word "claim" from the statute or redefine property against the statute's explicit language. We are not permitted "to add or subtract words from a statute[.]" *Friends of the*

*Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009). Rather, "it is an elementary principle of statutory construction that, in construing a statute, we must give meaning to all the words in the statute." *Legal Env't Assistance Found., Inc. v. U.S. E.P.A.*, 276 F.3d 1253, 1258 (11th Cir. 2001). The statute operates to protect those who had an interest in confiscated property, including shareholders, even if they did not own the property itself. *See Garcia-Bengochea*, 57 F.4th at 937 (Jordan, J., concurring) ("Nothing in the language of Title III indicates that Congress intended to limit the remedy to the original owners of the property[.]"); *Fernandez v. CMA CGM S.A.*, 683 F. Supp. 3d 1309, 1327 (S.D. Fla. 2023) ("The plain meaning of the word 'claim' is broad enough to encompass more than direct ownership. . . . Accordingly, like those who owned property directly, a shareholder gained a 'claim to' confiscated property once the shareholder's previous ownership rights were extinguished.") (citation omitted).

Next, Fernandez presented enough evidence that she had a stake in the confiscated companies to survive summary judgment. Although she initially testified that she did not recall owning shares of stock in any corporation, she later changed her testimony. Through errata sheets and an affidavit, she stated that she did recall that she was an equal owner in the family's businesses. Under Rule 30(e), a deponent may review the deposition and "if there are changes in form or substance, . . . sign a statement listing the changes and the reasons for making them." Fed. R. Civ. P. 30(e)(1)(B). Although we have not defined the limits within which Rule 30(e) can be used, a district court's ruling on the matter is

reviewed for abuse of discretion. *See EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 270 (3d Cir. 2010). The district court determined that the errata sheets were proper because Fernandez timely submitted her changes and provided reasons for doing so—namely, confusion at the time of questioning, fatigue, and mistake. Because the district court's order complies with the text of the rule, we cannot say that the court erred under the deferential abuse of discretion standard.

In addition to Fernandez's changed testimony, the district court relied on her prior testimony to determine that there was a genuine dispute of material fact. In particular, Fernandez testified that she attended corporate meetings and received annual dividends from the business, and that her family owned property around the Bay of Mariel. Even the Cuban government's own confiscation decree corroborates Fernandez's claim. In that decree, the Cuban government ordered the confiscation of "all the property and rights, whatever their nature," including "the shares . . . representing [Maritima and Azucarera's] capital" and "all the entities' properties, rights, and actions" from Fernandez. Based on the available evidence, the district court properly concluded that Fernandez presented enough evidence that she was a shareholder in the confiscated companies to survive summary judgment

## C.

After determining that Fernandez can bring a claim, we now consider her contention that Seaboard trafficked in Maritima's confiscated rights under the 1955 concession. She argues that the pre-

Castro Cuban government's 1955 decree granted Maritima the exclusive right to exploit port facilities in Mariel Bay. Thus, Fernandez says that when Seaboard berthed its vessels at the container terminal on the west side of Mariel Bay, it "engage[d] in a commercial activity using or otherwise benefitting from" Maritima's property rights under the concession. 22 U.S.C. § 6023(13)(A)(ii). Seaboard responds that the district court was correct to reject this argument because the 1955 decree granted Maritima only a nonexclusive concession to build port facilities on certain portions of Mariel Bay.

Because of the way the parties have litigated this dispute, we cannot resolve this issue without making two legal assumptions about the 1955 concession. First, we will assume without deciding that this concession is a cognizable property interest protected by the Act. *See id*. § 6023(12) (defining "property" covered by the Act). Second, we will interpret the 1955 decree as if it were a contract between Maritima and the Cuban government. Whether as a matter of pre-Castro Cuban law or federal common law, the parties (and the district court) rely on common law principles of contract interpretation to support their respective positions. We'll assume without deciding that they are correct to do so.

Under standard common law principles, "[c]ontract interpretation is generally a question of law." *Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd.*, 882 F.3d 1033, 1039 (11th Cir. 2018) (citation omitted). There are no issues of fact for a jury to decide unless "an ambiguous contract

term forces [us] to turn to extrinsic evidence of the parties' intent[.]" *Id.* (citation omitted). Under "general contract principles," a contract is ambiguous if it is "reasonably susceptible to more than one interpretation." *In re FFS Data, Inc.*, 776 F.3d 1299, 1304 (11th Cir. 2015) (internal quotations and citations omitted); *Maccaferri Gabions, Inc. v. Dynateria Inc.*, 91 F.3d 1431, 1439 (11th Cir. 1996). But just because the parties disagree on the meaning of a contractual term does not mean the contract is ambiguous. *See Bayshore Ford Truck Sales, Inc. v. Ford Motor Co.*, 380 F.3d 1331, 1335 (11th Cir. 2004).

Reviewing the text of the 1955 decree, we conclude that Seaboard did not traffic in any right conferred by the decree. By its own unambiguous terms, the 1955 decree did not grant Maritima an exclusive right to develop all future docks in the bay. The 1955 decree approved Maritima's application to build port facilities in Mariel Bay and granted it the right to do so for a term of seventy years. Although the concession exists "in the Bay of Mariel," nothing in the text of the decree purports to give Maritima an *exclusive* right to do anything at all. Instead, to the extent that the decree addresses exclusivity, it expressly states that Maritima's rights are not exclusive but rather existed "without detriment to the vested rights of third parties[.]" And nothing in the decree reflects a governmental promise not to grant additional concessions or build additional docks. *Cf. Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.*, 119 F.4th 1276, 1281–83 (11th Cir. 2024) (discussing the scope of a usufructuary concession granted by the Cuban government).

Rather than pointing to any text in the decree to support their exclusivity argument, Fernandez relies on the context of the agreement. Specifically, the decree allows Maritima to obtain government financing, and Fernandez argues that Maritima's ability to repay the government financing was predicated on the opportunity to raise revenue as the only maritime terminal in the area. We disagree. To be sure, the concession conveyed Maritima the apparently valuable right to construct port facilities for public use in the bay and provided financing to that end. But had Cuban history taken a different turn, one can easily imagine a robust commercial shipping industry in Mariel Bay that supports many public docks and shipping terminals, only one of which would be operated by Maritima. In any event, there is no reason to conclude that the government implicitly agreed not to build additional docks or allow additional shippers, just because it agreed to finance Maritima's project.

We also note that Fernandez's argument conflicts with the "whereas" clauses of the decree. "A preamble, purpose clause, or recital" such as a "whereas" clause, "is a permissible indicator of meaning." *Bittner v. United States*, 598 U.S. 85, 98 n.6 (2023) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 217 (2012)). The "whereas" clauses in the 1955 decree identify specific properties on the eastern side of the bay on which Maritima could build docks and suggest that a preexisting private dock could be converted to public use. The first "whereas" clause identifies rights in the "low lands and mangroves" on property Maritima owned "in the north coast of the province of Pinar del

Rio[.]" Likewise, the eighth "whereas" clause states that the concession allows Maritima "to convert to public use the dock and warehouse located on land of its property which were legalized and authorized for private use" through a 1934 decree. That land was in an area known as Punta Coco Solo on the east side of the bay in the town of Mariel. We cannot say these clauses—explaining the limits of Maritima's rights to the land—establish exclusivity to the bay.

Because Seaboard did not deliver to any dock that was built or operated by Maritima, we agree with the district court that Seaboard did not traffic in a property right secured by the 1955 decree. The decree limited Maritima's rights to building port facilities on its real estate in the eastern side of the bay. At no point did the pre-Castro government promise Maritima that it would be the only shipper in the bay or that no additional docks would be constructed for seventy years.

### D.

We now turn to Fernandez's two arguments that Seaboard trafficked in confiscated Azucarera land. She first argues that Seaboard "engage[d] in a commercial activity using or otherwise benefitting from" confiscated Azucarera land when it shipped goods to the container terminal because the terminal was partly built on confiscated Azucarera land. 22 U.S.C. § 6023(13)(A)(ii). Second, she argues that Seaboard trafficked by contracting with two Cuban entities—TCM and Taina—to ship its goods to Cuba. She says that through these contracts, Seaboard "cause[d], direct[ed],

participate[d] in, or profit[ed] from" TCM and Taina's trafficking, and that TCM and Taina trafficked by "engag[ing] in a commercial activity using or otherwise benefitting from confiscated property" when they transferred Seaboard's containers inland from its ships. *Id.* § 6023(13)(A)(ii)-(iii). We address these arguments in turn.

1.

We start with Fernandez's contention that Seaboard itself trafficked by "engag[ing] in a commercial activity using or otherwise benefitting from confiscated property[.]" *See id.* § 6023(13)(A)(ii). This subsection requires that the defendant engaged in (1) "commercial activity" that (2) "us[ed] or otherwise benefit[ed] from" (3) "confiscated property." *Id.*

The first element is easily resolved. Seaboard does not dispute that its shipping was a "commercial activity," and for good reason. The Act adopts the meaning of "commercial activity" from 28 U.S.C. § 1603(d), which defines it as "either a regular course of commercial conduct or a particular commercial transaction or act." *Id.* § 6023(3). Seaboard began shipping its goods to the container terminal in 2019 and contracts with two Cuban entities to unload its cargo and dock its vessels. It has made at least two dozen shipments to the terminal. Its multiple shipments to the container terminal were plainly a "regular course of commercial conduct" and each shipment was a "particular commercial transaction or act." *Id.* § 1603(d). Its only engagement with the property has been commercial in nature.

The third element is likewise easy to resolve. Seaboard argues that there is no evidence that where the terminal unloads cargo has any relation to the confiscated land. But we agree with the district court that the facts would allow a reasonable jury to conclude that the terminal extends beyond the boundaries of the old air base onto at least some real estate that the government confiscated from Azucarera. The bounds of Azucarera's landholdings in the area are unclear. But Fernandez's international mapping expert explained that "it is reasonable to conclude that" Azucarera owned land in "areas situated both north and south of the naval air station," as shown below:



Further, Fernandez produced the following illustration from the Cuban government that shows that the container terminal, designated by the grey box, extends onto land that surrounded the old naval air station:



Viewing these facts in the light most favorable to Fernandez, she has established for purposes of summary judgment that Seaboard used a terminal that was built at least in some part on confiscated land.

The second element is more complicated. Seaboard argues (and the district court held) that, assuming the terminal was at least partly built on confiscated land, there is no evidence that its commercial activity "uses" or "otherwise benefits from" that slice of real estate. But the Act defines neither "use" nor "otherwise benefit from." So we must determine the "ordinary, everyday meanings" of those terms. Scalia & Garner, *supra*, at 69. And, to that end, we turn to dictionaries, which "state[] the core meaning[] of a term." *Id.* at 418. Indeed, "a dictionary definition is an assertion of the very meaning that an ordinary person would give a particular word

because it is the result of an examination into the interpretation that ordinary people would give the word." *Robinson v. Liberty Mut. Ins. Co.*, 958 F.3d 1137, 1140 (11th Cir. 2020) (cleaned up).

Dictionaries define the word "use" as to "convert to one's service," to "avail oneself of," to "employ," or to "carry out a purpose or action by means of." *See Use, Webster's New International Dictionary of the English Language* (*Webster's Second*) (2d ed. 1937) (defining "to use" as "[t]o convert to one's service" or "to employ"); *Use, Webster's New International Dictionary of the English Language* (*Webster's Third*) (3d ed. 1961) (defining "use" as "to put into action or service"); *Use, Black's Law Dictionary* (6th ed. 1990) (defining "use" as "[t]o make use of; to convert to one's service; to employ; to avail oneself of; to utilize; to carry out a purpose or action by means of"); *Use, Black's Law Dictionary* (11th ed. 2019) (defining "use" as "[t]o employ for the accomplishment of a purpose; to avail oneself of"); *Use, The Oxford English Dictionary* (2d ed. 1989) (defining "use" as "to put into practice or operation; to carry into action or effect" and "to make use of . . . as a means or instrument; to employ for a certain end or purpose"). Black's Law Dictionary also defines "commercial use" as "[a] use that is connected with or furthers an ongoing profit-making activity." *Commercial Use, Black's Law Dictionary* (11th ed. 2019). Neither the Act nor these definitions suggest that "use" must be direct or physical. Thus, to "use" confiscated property suggests that a person must make that property of service to them, avail themselves of that property, or carry out some action in connection with the property, either directly or indirectly.

Dictionaries define the word "benefit" as something that is "useful or profitable," or something a person gains an "advantage or privilege" from. *See Benefit*, *Black's Law Dictionary* (11th ed. 2019) (defining "benefit" as "[t]he advantage or privilege something gives; the helpful or useful effect something has," and "profit or gain"); *Benefit*, *Webster's Second* (defining "benefit" as "a pecuniary advantage or profit"); *Benefit*, *Webster's Third* (defining "benefit" as "to be useful or profitable"); *Benefit*, *The Oxford English Dictionary* (2d ed. 1989) (defining "benefit" as "to receive benefit, to get advantage; to profit"). Furthermore, a statute should be read in such a way that gives every word meaning. Scalia & Garner, *supra*, at 440; *see United States v. Rice*, 671 F.2d 455, 460 (11th Cir. 1982) ("[T]he choice of different verbs" in a statute is one "which we properly take as evidence of an intentional differentiation[.]"). Read in context, "otherwise benefit" must mean something different and broader than simply "using." *See Otherwise*, *Black's Law Dictionary* (10th ed. 2014) (defining "otherwise" as "[i]n a different way" or "in a different manner"); *Otherwise, The American Heritage Dictionary of the English Language* (defining "otherwise" as "[i]n another way; differently"). And again, the statute and these definitions lack any suggestion that the "benefit" must be directly attributable to a given source. Thus, to "benefit" from confiscated real estate, a person must gain some profit, advantage, or privilege from the property. The district court determined that Fernandez failed to present evidence that Seaboard's commercial activity "used" or "benefited" from the confiscated land. Given our understanding of the catchall provision, we disagree.

On this record, a reasonable factfinder could determine that the Cuban government confiscated Fernandez's property and used part of it to construct and operate the container terminal. And it's reasonable to believe that Seaboard's commercial activity "otherwise benefit[s]" from Fernandez's property, even if Seaboard did not directly encroach upon it—because without Fernandez's property the terminal could not have been built and could not operate as it does today. A reasonable factfinder could conclude that by using the terminal, Seaboard benefits from the confiscated property because the larger terminal's existence and operation is what allows Seaboard to conduct its shipping activities.

In short, we disagree with the district court that Fernandez's theory of liability necessarily fails. Our reading of the law may seem broad, but the Act imposes broad liability. Congress designed the Act not just to compensate victims of the Castro regime, but to deter third parties from using or benefitting from confiscated property. *See* 22 U.S.C. § 6081(11) ("To deter trafficking in wrongfully confiscated property, . . . victims of these confiscations should be endowed with a judicial remedy . . . that would deny traffickers any profits from economically exploiting Castro's wrongful seizures."); *Penn. Dept. of Corrections v. Yeskey*, 524 U.S. 206, 212 (1988) ("[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.") (internal quotation marks and citation omitted). Accordingly, we believe a factfinder could conclude that Seaboard benefited from confiscated property when it delivered commercial goods to a dock that is partly built on confiscated land.

2.

Fernandez separately argues that she has presented evidence that Seaboard trafficked in confiscated property through its contracts with TCM and Taina. She says that, through these contracts, Seaboard "direct[ed], participate[d] in, or profit[ed] from" TCM and Taina's trafficking. *Id*. § 6023(13)(A)(iii). The statute does not define the terms "participates," "directs," or "profits," so we must determine the "ordinary, everyday meanings" of those terms. Scalia & Garner, *supra*, at 69. To "participate" means to take part in something. *See Participate*, *Webster's Second* (defining "participate" as "to have a share in common with others; to partake" and "to share in profits"); *Participate*, *Webster's Third* (defining "participate" as to "partake" and "to take part in something"); *Participation*, *Black's Law Dictionary* (11th ed. 2019) (defining "participation" as "[t]he act of taking part in something"); *Participate*, *The Oxford English Dictionary* (2d ed. 1989) ("To take or have a part or share of or in . . . ."). To "direct" means to be in charge of or control the actions of another. *See Direct*, *Webster's Second* (defining "direct" as "to cause (a person or thing) to turn, move, point, or follow a course" and "to regulate the activities or course of"); *Direct*, *Webster's Third* (defining "direct" as "to regulate the activities or course of" and "to guide and supervise"); *Direct*, *The Oxford English Dictionary* (2d ed. 1989) ("To give authoritative instructions to; to ordain, order or appoint (a person) to do a thing . . . ."). A person "profits" if they gain some return or advantage. *See Profit*, *Webster's Second* ("Advantage; benefit."); *Profit*, *Webster's Third* ("[A]n advantage, benefit,

accession of good, gain, or valuable return, especially in financial matters . . . ."); *Profit*, *The Oxford English Dictionary* (2d ed. 1989) ("To make progress; to advance, go forward; to improve, prosper, grow, increase."); *Profit*, *Black's Law Dictionary* (11th ed. 2019) (defining "profit" as "[t]he excess of revenues over expenditures in a business transaction"). Thus, Fernandez must present evidence that Seaboard took part in, controlled the actions of, or gained some return on TCM and Taina's trafficking.

Fernandez argues that TCM traffics by "manag[ing] . . . confiscated property" and that Seaboard "participates" in that trafficking through the parties' contractual relationship. Neither party disputes that TCM operates and manages the container terminal, which allegedly includes some part of confiscated land. But no provision of Seaboard's contract with TCM or any other evidence indicates Seaboard "participates" in TCM's management of the terminal.

Fernandez also says that TCM and Taina traffic by transporting Seaboard's goods inland across land that Azucarera owned. She provides no specific facts as to whether or how TCM and Taina transport items from the terminal. But Fernandez's theory is that Azucarera owned all the land surrounding the container terminal and so, however items are removed, the goods must be moved across Azucarera land. Fernandez further argues that Seaboard "directs" or "profits from" those entities' activity through contracts with TCM and Taina that require those entities to transport Seaboard's goods inland from the container terminal.

28                    Opinion of the Court                    22-12966

There are two main problems with this theory.

First, a reasonable factfinder could not find—based on this record—that the *only* means of egress from the container terminal is over land confiscated from Azucarera. There is no evidence about whether or how the old naval airbase could be accessed by land before it became a shipping terminal. Even though a reasonable jury could conclude that at least some parts of the terminal were built on land confiscated from Azucarera, it is speculation to conclude that the *only* way to access the terminal is over land that was confiscated from Azucarera. But a jury cannot infer facts based on "speculation and conjecture[.]" *See Blackston v. Shook & Fletcher Insulation Co.*, 764 F.2d 1480, 1482 (11th Cir. 1985).

Second, a factfinder would have to speculate to find that Seaboard "directed" or "profited from" TCM's or Taina's activities. Fernandez relies exclusively on Seaboard's contracts with those entities as evidence of its relationship with them, but the contracts alone do not bear out Fernandez's argument. The TCM contract provides that Seaboard may demand that TCM ship goods inland. Similarly, the Taina contract provides that Seaboard may require Taina to "arrange inland haulage . . . according to Shippers [sic] instructions[.]" But there is no evidence about what happened to any goods that Seaboard shipped. There is no evidence of how TCM and Taina operate generally at the container terminal or beyond, no evidence of what those entities did with any of Seaboard's shipments, no evidence of what use or benefit those entities derived from any confiscated land in their activities, and no evidence that

TCM or Taina acted "knowingly and intentionally" as required under the Act. *See* 22 U.S.C. § 6023(13)(A).

In short, Fernandez has enough evidence to hypothesize that TCM or Taina *could* have used or benefitted from confiscated land, and that Seaboard *could* have directed or profited from that trafficking. But that kind of speculation is not "enough of a showing that the jury could reasonably find for" the Fernandez. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). We have explained that "an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982) (internal quotations omitted). Simply put, Fernandez asks the factfinder to make inferences based on a guess or a possibility. *See Blackston,* 764 F.2d at 1482 (summary judgment for defendant where asbestos-exposure plaintiff presented evidence that he worked in proximity to insulators and that some insulators who worked in the same mill used asbestos-containing insulation but no evidence he worked with those specific insulators). Thus, we agree with the district court that this theory of liability cannot support a judgment in Fernandez's favor.

*E.*

Seaboard argues that even if it did use or benefit from the confiscated property, Fernandez cannot prove that it did so "knowingly and intentionally" as required by the statute. *See* 22 U.S.C. § 6023(13)(A). We disagree.

First, Seaboard argues that the facts fail to show that it acted "knowingly" or "intentionally." Fernandez contends that Seaboard knowingly and intentionally trafficked in confiscated property because it continued to use the port of Mariel after Fernandez sent letters notifying it of the violation. In these letters, Fernandez explained that she owned claims to the "ports, docks, warehouses and land at the port of Mariel," that Seaboard "benefitted, and continues to benefit, from trafficking in the Confiscated Property," and that she intended to file suit under the Act if Seaboard did not stop trafficking. According to Fernandez, this notice could support a determination that Seaboard knowingly and intentionally trafficked in the property. The parties also disagree as to whether the Act requires that Seaboard "knowingly and intentionally" engaged in commercial activity covered by the Act or whether it must also knowingly and intentionally benefit from property it knew to be confiscated.

We need not decide what Seaboard must know or what its intentions must be in order to be liable under the Act because the letter is sufficient to create a genuine dispute of material fact under either construction. As previously mentioned, Seaboard does not dispute that it was engaging in commercial activity by shipping its goods to the container terminal. And the information contained in the letter could support a finding that Seaboard knew both that the property was confiscated and that it was benefiting from that property. Based on this evidence, we cannot say that Seaboard was entitled to summary judgment on this basis.

*F.*

Next, Seaboard argues that it cannot be found liable because its conduct fell under the "lawful travel" exception. Under the Act, the term "traffics" does not include "transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel[.]" 22 U.S.C. 6023(13)(B)(iii). But Seaboard stretches the meaning of this exception too far.

The Act clearly distinguishes between trade and travel. For example, the Act defines "the economic embargo of Cuba" as referring to "all restrictions on trade or transactions with, and travel to or from, Cuba[.]" *Id.* § 6023(7). When Congress uses different terms, we expect that they hold different meanings, especially when the same meaning would render one of the terms superfluous. *See Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, . . . different terms usually have different meanings."). Because we must give meaning to all the words in a statute, we must interpret "trade" and "travel" differently. *See Legal Env't Assistance Found., Inc.*, 276 F.3d at 1258.

Dictionary definitions of these terms and federal law's application of them confirm our intuition. Dictionary definitions suggest that "trade" refers specifically to the transfer of goods while "travel" concerns the movement of people. *Compare Trade*, *Webster's New College Dictionary* (1996) ("the buying and selling of commodities or the bartering of goods; commerce"), *with Travel, id.* ("to go from one place to another; make a journey or journeys").

And federal regulations implementing the Act that Congress has since codified, *see* 22 U.S.C. § 6032(h), reinforce this distinction. Those regulations impose different restrictions on the movement of people and the movement of goods. *Compare* 31 C.F.R. § 515.571(a) (authorizing "transactions ordinarily incident to travel," all referring to "personal" use and consumption); *id*. § 515.560(a) (allowing authorization of "travel-related transactions" referring generally to the movement of people), *with id*. § 515.533 (describing transactions related to the "exportation" or "reexportation of items," the "shipping of specific exports or reexports," and those that are "incident to the importation . . . of items").

Based on the ordinary meaning of "travel" and "trade," as well as the statutory and regulatory language related to these terms, we conclude that the lawful travel exception does not apply to Seaboard's conduct. Seaboard delivered commercial goods to Cuba; it did not engage in "lawful travel." And although the lawful travel exception does not apply here, we express no view on how it may apply in other scenarios.

## G.

Finally, Seaboard argues that summary judgment was proper because Fernandez failed to present adequate evidence of damages. Again, we disagree. Fernandez provided two expert reports that estimated damages. Seaboard objects to the estimated amount and the way it was calculated, but those arguments are not proper on appeal from the grant of summary judgment. By presenting these estimates, Fernandez established a genuine dispute of

material fact, and if Seaboard wants to challenge them it can do so at a *Daubert* hearing or otherwise before the district court. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

Seaboard also suggests that these potential damages may raise constitutional concerns if a jury found it liable and awarded damages. But again, we cannot say at this juncture whether these potential damages are proper. Nor is it appropriate for us to consider a constitutional challenge to a hypothetical damages award on appeal. *Parr v. United States*, 351 U.S. 513, 516 (1956) ("Only one injured by the judgment sought to be reviewed can appeal[.]"). Seaboard can raise these issues if and when it is found liable and ordered to pay damages.

## IV.

The district court is **AFFIRMED IN PART** and **REVERSED IN PART**. The claims of the following parties were correctly dismissed: Emma Ruth Blanco, in her personal capacity and as personal representative of the estate of Alfredo Blanco Rosell, Jr.; Hebe Blanco Miyares, in her personal capacity and as personal representative of the estate of Byron Blanco Rosell; Sergio Blanco de la Torre, in his personal capacity and as administrator ad litem of the estate of Enrique Blanco Rosell; Eduardo Blanco de la Torre, as administrator ad litem of the estate of Florentino Blanco Rosell; Liana Maria Blanco; Susannah Valentina Blanco; Lydia Blanco Bonafonte; Jacqueline M. Delgado; Byron Diaz Blanco, Jr.; Magdelena Blanco Montoto; Florentino Blanco de la Torre; Joseph E. Bushman; Carlos Blanco de la Torre; and Guillermo Blanco de la Torre.

The district court properly granted summary judgment as to Fernandez's claim arising from the 1955 concession to Maritima. Fernandez's claim that Seaboard trafficked and profited from Azucarera's confiscated land may go forward.

22-12966                JORDAN, J., Concurring                    1

JORDAN, Circuit Judge, Concurring.

I join Judge Brasher's opinion for the court in full, and write separately with some further observations on a couple of issues.

## I

Title III of the Helms-Burton Act Title states that trafficking includes "engag[ing] in a commercial activity using or otherwise benefiting from confiscated property[.]"    22 U.S.C. § 6023(13)(A)(ii).  As far as I can tell, Congress has employed the "or otherwise benefit[s] from" language in only one other similar statute providing a federal right of action against third parties—a now-repealed provision of the Comprehensive Anti-Apartheid Act of 1986, Pub. L. No. 99-440, § 403, 100 Stat. 1086 (1986).  *See* 22 U.S.C. § 5083(a) ("Any national of the United States who is required by this Act [ ] to terminate or curtail business activities in South Africa may bring a civil action for damages against any person, partnership, or corporation that takes commercial advantage or otherwise benefits from such termination or curtailment."), *repealed by* South African Democratic Transition Support Act of 1993, Pub. L. 103-149, § 4, 107 Stat. 1503 (1993).  But I have not found any cases decided under that provision which interpreted or applied the "or otherwise benefits from" language.[1]

---

[1] For a general discussion of this short-lived (and apparently unused) federal cause of action, see Louis K. Rothberg, *Sections 402 and 403 of the Comprehensive Anti-Apartheid Act of 1986*, 22 Geo. Wash. J. Int'l L. & Econ. 117, 149–72 (1988).

I agree with the court's reading of the phrase "otherwise benefiting from" in 22 U.S.C. § 6023(13)(A)(ii).  Because we generally do not read different words or terms in a statute to mean the same thing, *see Pulsifer v. United States*, 601 U.S. 124, 149 (2024), it seems to me that this phrase means something different and more expansive than the verb "using."  *See* The American Heritage Dictionary of the English Language 1246 (4th ed. 2009) (defining "otherwise" as "[i]n another way; differently"); Black's Law Dictionary 1325 (12th ed. 2024) (defining "otherwise" as "[i]n a different way" or "in another manner").

## II

The court holds that the "lawful travel to Cuba" exception set out in 22 U.S.C. § 6023(13)(B)(iii) does not apply to the run-of-the-mill commercial delivery of goods (like gift parcels or frozen chicken) to Cuba.  I agree, but the court does not directly address one of Seaboard's contrary arguments and I do so below.

Seaboard asserts that its transportation of gift parcels and frozen chicken to Cuba was authorized by federal regulations and therefore constituted "lawful travel."  *See* Brief for Appellee at 50–53.  For example, licenses for exports to Cuba are not needed for "[g]ift parcels and humanitarian donations" (the GFT exception) or for "agricultural commodities" (the AGR exception).  *See* 15 C.F.R. § 746.2(a)(1)(viii), (xii).  Seaboard maintains that the gift parcels satisfied the GFT exception, codified at 15 C.F.R. § 740.12, because the shippers agreed by contract that the parcels would meet the regulatory requirements and certified that they indeed met those

requirements. Seaboard also contends that frozen chicken is an "agricultural commodity" and the shipments of that commodity met the requirements of the AGR exception, codified at 15 C.F.R. § 740.18. [2]

No court has squarely addressed Seaboard's interpretation of the "lawful travel to Cuba" exception, but one has assumed (without deciding) its general validity in denying a motion to dismiss in a separate Helms-Burton action brought by Ms. de Fernandez  *See de Fernandez v. MSC Mediterranean Shipping Co. S.A.*, No. 1:22-cv-6305-GHW, 2024 WL 5047492, *20 (S.D.N.Y. Dec. 9, 2024) ("[E]ven assuming, without deciding, that compliance with 15 C.F.R. § 740.18(a) would suffice to establish a lawful-travel defense under [22 U.S.C. §] 6023(13)(B)(iii), it is not clear from the face of the pleadings that Defendants complied with those regulations."). In some other Helms-Burton cases that previously came before us, the United States took the position that "'lawful travel to Cuba' . . . means travel for which transactions are authorized under the Cuban Assets Control Regulations [e.g., 31 C.F.R. §§ 515.201, 515.560, 515.565]" or "other regulatory regimes" like the "Export Administration Regulations promulgated by the Bureau of Industry and Security in the Commerce Department [e.g., 15 C.F.R. § 746.2]." Brief for the United States as *Amicus Curiae* in *Del Valle et al. v.*

---

[2] Seaboard does not argue that it is engaged in "lawful travel to Cuba" under the regulations set out in Part 515 of Title 31 of the Code of Federal Regulations. I therefore do not address those regulations.

*Trivago GMBH et al.*, Case Nos. 20-12407, 20-12960, 20-14251, 2022 WL 1135129, at 34 & n.6 (Apr. 11, 2022).

As a verb, travel generally means "[t]o go from one place to another as on a trip" or "journey" or "[t]o go from place to place as a salesperson or agent." The American Heritage Dictionary of the English Language 1836 (4th ed. 2009) (defs. 1 & 2). *See also* 2 Shorter Oxford English Dictionary 3334 (5th ed. 2002) ("Go from one place to another; make a journey, esp. of some length or abroad.") (def. 2). Travel, however, can also mean "to be transmitted, as light or sound[,] move or pass." American Heritage Dictionary at 1836 (def. 3). As with other Helms-Burton interpretive matters, the question for us is what sense of the word to use when figuring out the meaning of § 6023(13)(B)(iii). *See Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring) ("The word 'acquires' has both broad and narrow meanings, and dictionaries do not tell us what meaning to use for Title III. So we have to rely on matters outside of the text to interpret the text.").

In my view, Seaboard's reading of the phrase "lawful travel to Cuba"—though grammatically permissible—does not carry the day. Like the court, I think the better reading of "lawful travel to Cuba" is one that requires the volitional conduct of the actor engaged in the journey. I reach that conclusion for several reasons.

First, travel is usually an "active verb." *United States v. Seward*, 967 F.3d 57, 67 (1st Cir. 2020). And inanimate objects like gift parcels and frozen chicken do not move from one place to another

on their own. *Cf. Hill v. United States*, 103 Ct. Cl. 597, 606 (1945) (addressing the meaning of the phrase "during travel under orders" in a congressional act: "When used with reference to a movement by private or common carrier, the word 'travel' is more often applicable to a voluntary agent than to inanimate objects such as household goods.").

Second, statutory interpretation should take into account the way people usually speak and how they use language in everyday conversations. *See Bondi v. VanDerStok*, ___ S.Ct. ___, 2025 WL 906503, at * 6 (U.S. Mar. 26, 2025) (discussing how "everyday speakers sometimes use artifact nouns"); *Lockhart v. United States*, 577 U.S. 347, 364 (2016) (Kagan, J., dissenting) (considering the "completely ordinary way that people speak and listen, write and read"); *United States v. Caniff*, 916 F.3d 929, 941 (11th Cir. 2019) (Newsom, J., concurring in part and dissenting in part) ("First, and most obviously, that's just not how people talk."), *vacated and superseded*, 955 F.3d 1183 (11th Cir. 2020). Although "conversational conventions do not control [the] legal analysis," *Bostock v. Clayton County*, 590 U.S. 644, 646 (2020), they are certainly relevant, as we recognized in *Heyman v. Cooper*, 31 F.4th 1315, 1320 n.3 (11th Cir. 2022).

In normal conversation we use the word travel to refer to persons who have chosen to embark on a journey and not to inanimate goods or commodities that are transported by others. It would be odd, I think, for one person to say to another over coffee that gift parcels or crates of frozen chicken traveled to Cuba. *See*

*Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1312 (11th Cir. 2013) ("[C]ommon sense is not irrelevant in construing statutes[.]").

I close by emphasizing that our holding concerning the "lawful travel to Cuba" exception is narrow, and concerns only Seaboard's transportation of gift parcels and frozen chicken. We leave for another day whether and how this exception might apply to other Cuba-related commercial activities such as cruise ship travel.

### III

With these thoughts, I join the court's opinion.