**NOT FOR PUBLICATION**

# In the
# United States Court of Appeals
# For the Eleventh Circuit

————————————————

Nos. 24-13070, 24-13738
Non-Argument Calendar

————————————————

K. JEFF CARNEY, M.D., PHARM.D.,

*Plaintiff-Appellant,*

*versus*

EMORY UNIVERSITY,

*Defendant-Appellee.*

————————————————

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-04531-TWT

————————————————

Before JORDAN, ROSENBAUM, and KIDD, Circuit Judges.

PER CURIAM:

K. Jeff Carney, M.D., Pharm.D., appeals the district court's grant of summary judgment to his former employer, Emory Uni-

versity, on his claim that Emory unlawfully required him to undergo a "medical examination," in violation of the Americans with Disabilities Act ("ADA"), *see* 42 U.S.C. § 12112(d)(4)(A), when it ordered him to receive leadership coaching following an internal investigation of complaints from medical residents. Because the record does not support a reasonable inference that the coaching requirement included a medical examination or inquiry, we affirm the grant of summary judgment in Emory's favor.

## I.

Dr. Carney worked for the Department of Urology in Emory's School of Medicine. He was a urologist at Grady Hospital, where he also served as the site director for the residency program and director of undergraduate medical education. According to Dr. Carney, training residents and fellows was one of his most important job duties.

From 2013 through the remainder of his employment, Dr. Carney reported to Dr. Martin Sanda, the chair of Emory Urology. Dr. Carney testified that, during several disagreements with Dr. Sanda between May 2015 and July 2020, Dr. Sanda told Dr. Carney he needed to have his "head examined."

In July 2022, the residency director for Emory Urology sent Dr. Sanda an email about certain concerns she had heard from Grady residents. These concerns were about Dr. Carney and they related to professionalism and respectfulness. Among other concerns cited in the email, female residents had complained about Dr.

Carney touching them and making derogatory jokes about female surgeons.  They also said they feared retaliation.

The School of Medicine conducted an internal investigation. It interviewed both urology residents and Dr. Carney.  Dr. Carney called the residents' complaints "lies."  He said he would "never" work with the complaining residents again, even if it meant losing his job.[1]  The review found that Dr. Carney's denials and explanations "were generally convincing," but that he failed to appreciate the impact his telling inappropriate jokes had on his reputation.

On January 4, 2021, Dr. Sanda emailed Dr. Carney.  He said that, while the internal review "did not find cause for disciplinary action," it did "confirm behaviors that warrant guidance," including a need to "improve [his] awareness of how [his] behaviors and actions affect others and to enhance [his] approach in navigating conflict."  To that end, Dr. Carney was directed to do two things: (1) "engage with Gordon Tuttle of FSAP [(Emory's Faculty Staff Assistance Program)] for coaching regarding navigating conflict, leadership, and responding to feedback"; and (2) complete a "professional development" program regarding sensitivity to boundaries.

Tuttle, a licensed psychologist, was the manager of physician services at FSAP.  Dr. Sanda's e-mail went on to explain that

---

[1] The complaints were referred to Emory's Title IX office, which reached out to the complaining residents.  But no investigation was opened since none of the witnesses responded.

Dr. Carney's "engagement with Gordon Tuttle for professional development coaching is considered vital to advance the communication skills necessary" for him to resume his leadership position. Tuttle was copied on this email.

Dr. Carney completed a professional development program, but he refused to see Tuttle. In March 2021, Dr. Sanda emailed Dr. Carney about "next steps." Those included contacting Tuttle "by the end of this week." Dr. Sanda advised that Tuttle "has expertise in coaching clinical faculty on avoiding and resolving conflict and communicating effectively that will be invaluable to you and to the team alike," and that he would "assess your goals and recommend strategies for moving forward." When Dr. Carney failed to connect with Tuttle, Dr. Sanda sent another email stating that "connecting with [Tuttle] is a necessary step" to "repair the learning environment."

Dr. Carney viewed the requirement to visit Tuttle as "childish," demeaning, and unnecessary. He also felt it was an unlawful requirement to undergo a medical examination or inquiry into his mental health, based on Dr. Sanda's prior comments that he needed his "head examined." Dr. Carney made clear to Dr. Sanda in several emails that he had "no intention of seeing" Tuttle. Dr. Carney insisted that Dr. Sanda was "inventing a problem that does not exist," that no coaching was necessary, and that he had been "cleared" of the residents' "false accusations."

The standoff continued through May 2021. At that point, Dr. Sanda told Dr. Carney that he could work with Rick Brandt,

who was another leadership coach Dr. Sanda had worked with several years earlier, or a "suitable alternative coach," instead of Tuttle. In an email on May 8, Dr. Sanda stressed that Dr. Carney's "commitment to engage earnestly in leadership coaching will be a necessary first step" to remaining at Emory. According to Dr. Carney, Dr. Sanda told him on May 7, the day before the email, that "Brandt was a psychologist who would be able to help [him] work through [his] mental issues."

On May 26, 2021, Emory notified Dr. Carney that his appointment would not be renewed beyond August 31, 2021.

Following the non-renewal decision, Dr. Carney twice met with Tuttle, on June 1, 2021, and July 6, 2021. Before doing so, Dr. Carney signed a consent form to use FSAP's services, which explained that FSAP provides services to faculty and stuff "through assessments, consultations, interventions, education, and prevention programs." It explained, "Your first session with the FSAP clinician will involve an assessment to determine the type of services [that] may best meet your needs. We help employees discover and manage options and resources for dealing with any situation, behavior, or concern that may affect their ability to live or work in a healthy manner."

On June 1, Dr. Carney had a video call with Tuttle, who was in his FSAP office. Tuttle began by asking about Dr. Carney's sleep patterns, exercise and energy levels, appetite, stress management, and worrying. Tuttle acknowledged that these questions could be

relevant to assessing depression and anxiety.  But he otherwise testified that "coaching isn't a medical service," and that he was simply checking in with Dr. Carney since he had "just lost his job."  Tuttle said that he offered both "mental health services" and "nonmedical physician coaching," with the latter focused on the physicians' "professional goals."  At the second appointment in July, Tuttle recommended that Dr. Carney read a book on emotional intelligence.

## II.

Dr. Carney sued Emory in federal court in November 2021. As relevant here, he alleged that Emory violated the ADA by terminating him for refusing a medical examination that was not job-related or consistent with business necessity.  *See* 42 U.S.C. § 12112(d)(4)(A).[2]

After discovery, Emory moved for summary judgment, arguing that the required coaching did not involve a medical examination and that, even if it did, the requirement was job related and consistent with business necessity.  Dr. Carney responded in opposition, and Emory replied.  A magistrate judge held a hearing on the motion in May 2024.

---

[2] Dr. Carney also brought a claim alleging a violation of his *de facto* tenure rights, which the district court dismissed.  He has not briefed that claim on appeal, so it is abandoned. *See Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008) (issues not briefed on appeal are "deemed abandoned").

Following the hearing, the magistrate judge issued a final report and recommendation ("R&R"), recommending that the district court grant Emory's motion for summary judgment. Dr. Carney filed objections, but the district court overruled them, adopted the R&R, and denied reconsideration. Dr. Carney now appeals.

## III.

We review the district court's grant of summary judgment de novo. *Owens v. Governor's Office of Student Achievement*, 52 F.4th 1327, 1333 (11th Cir. 2022). "Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* (quotation marks omitted).

We "view the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in that party's favor." *Id.* (quotation marks omitted). But "inferences based upon speculation are not justifiable." *Id.* (quotation marks omitted). "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). Thus, "[i]f the nonmoving party presents evidence that is merely colorable or not significantly probative, summary judgment is appropriate." *Boyle v. City of Pell City*, 66 F.3d 1280, 1288 (11th Cir. 2017) (quotation marks omitted).

## IV.

Dr. Carney alleges that the coaching requirement amounted to a prohibited medical examination. The ADA generally prohibits

employers from "requir[ing] a medical examination" or "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). A plaintiff need not be disabled or regarded as disabled to bring a claim under this provision. *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1310–11 (11th Cir. 2013).

Section 12112(d)(4) applies when an employer "request[s] a medical examination or inquire[s] into an employee's medical status." *Mullin v. Sec'y. v. U.S. Dep't of Veterans Affs.*, 162 F.4th 1296, 1309 (11th Cir. 2025). Neither the statute nor the regulations define a "medical examination." *See* 29 C.F.R. §§ 1630.13, 1630.14. Thus, both parties rely on enforcement guidance issued by the Equal Employment Opportunity Commission ("EEOC"). *See* EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act* (EEOC Notice 915.002) (July 27, 2000), https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees (last visited April 1, 2026). While not controlling, such guidance "constitute[s] a body of experience and informed judgment to which we may properly resort for guidance." *Harrison v. Benchmark Electronics Huntsville, Inc.*, 593 F.3d 1206, 1214 (11th Cir. 2010) (cleaned up).

The EEOC Enforcement Guidance defines a "medical examination" as a "procedure or test that seeks information about an

individual's physical or mental impairments or health." *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809, 816 (6th Cir. 2012) (quoting this guidance). It outlines seven factors to determine whether a test or procedure is "medical," though it notes that "one factor may be enough." *Id.* The factors include whether the test is administered or interpreted by a healthcare professional, whether the test is designed to reveal an impairment or physical or mental health, how invasive the test is, and whether the test normally is given in the medical setting or involves medical equipment. *See id.* The guidance further states that medical examinations include "psychological tests that are designed to identify a mental disorder or impairment," but not "psychological tests that measure personality traits such as honesty, preferences, and habits." *Id.*

The EEOC Enforcement Guidance also explains that § 12112(d)(4) generally prohibits "disability-related inquir[ies]," which are questions "likely to elicit information about a disability." EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act* (2000), https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees. But employers are permitted to ask other non-disability related questions, including "asking generally about an employee's well being (e.g., How are you?), asking an employee who looks tired or ill if s/he is feeling okay, asking an employee who is sneezing or coughing whether s/he has a cold or allergies, or asking how an employee is doing following the death of a loved one or the end of a marriage/relationship[.]" *Id.*

Here, the record does not support a reasonable inference that Emory required Dr. Carney to undergo a "medical examination" under the ADA. Dr. Carney was not referred broadly for "psychological counseling," like the plaintiff in *Kroll*. *See Kroll*, 691 F.3d at 819–20. Rather, the evidence reflects that Dr. Sanda ordered Dr. Carney to obtain coaching from Tuttle (or later from an alternate coach, Brandt). And that coaching was specifically for "navigating conflict, leadership, and responding to feedback," and for "avoiding and resolving conflict and communicating effectively," which Dr. Sanda said was "vital to advance the communication skills necessary" for him to resume his leadership position. Dr. Carney offers no evidence that he was required to undergo a "procedure or test" as part of this coaching or otherwise.

The evidence Dr. Carney cites does not create a genuine issue of material fact on this question. Dr. Carney points out that FSAP provides an array of services, including some that qualify as medical examinations, that the FSAP consent form he signed covered all these services, and that Tuttle and Brandt were psychologists. But, as the magistrate judge observed, these facts say very little about what services Dr. Carney was to receive from Tuttle or Brandt. The mere fact that Dr. Carney could have obtained mental-health services or psychological counseling from Tuttle, Brandt, or FSAP is not evidence he was required to receive these services.

Dr. Carney also contends that Tuttle asked him "invasive" questions about sleep, appetite, exercise, and stress, which he notes are relevant to assessing an individual's mental condition. There

are a few problems with this reasoning. For starters, it's not reasonable to infer that Tuttle would have asked the same exact questions of Dr. Carney had he engaged Tuttle's services earlier—that is, before Dr. Carney was informed of the nonrenewal of his appointment at Emory. When Dr. Carney first met with Tuttle, he had just lost his job at Emory. He also refused to discuss the issues for which coaching had been ordered. It's a stretch to say that the content of this session is meaningfully comparable to the (hypothetical) content of an earlier session.

What's more, the EEOC guidance generally permits inquiries about an employee's well-being and "how an employee is doing following" a significant life event, such as the "the death of a loved one," "the end of a marriage/relationship," or, as here, the loss of a long-term position of authority. EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act* (2000), https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees.

Tuttle testified that his coaching sessions started with "niceties or a check-in," which could include asking "really gross indicators [of] how someone is doing," and it's undisputed that Dr. Carney had just lost his job when he first met with Tuttle. There is no evidence that Tuttle attempted to follow up on his broad inquiries, conducted any psychological testing, reviewed Dr. Carney's medical records, or made any findings or diagnosis. So while Tuttle's initial questioning may have touched broadly on issues related to

mental health, we see no evidence that the coaching in question was "likely to probe and explore whether [Dr. Carney] suffered from a mental-health disability, regardless of whether this was [Emory's] intention." *Kroll*, 691 F.3d at 819–20; *cf. Karraker v. Rent-A-Center, Inc.*, 411 F.3d 831, 835–37 (7th Cir. 2005) (reasoning that use of the Minnesota Multiphasic Personality Inventory was a "medical examination").

And the record otherwise reflects that Emory's physician coaching was nonmedical and focused on professional goals. Tuttle testified that it was not necessary to assess or evaluate an individual's mental condition to engage in coaching, and that he did not perform exams or assessments to diagnose a mental condition as part of his coaching work with Emory. In addition, Emory's Fed. R. Civ. P. 30(b)(6) witness testified that physician coaching involved a non-clinical assessment of the individual's strengths and weaknesses, and that Emory never referred physicians for psychological counseling or treatment.

Dr. Carney also claims that Dr. Sanda told him that Brandt was a psychologist who could "help [Dr. Carney] work through [his] mental issues," which, in his view, supports a reasonable inference that any coaching with Brandt would involve a psychological assessment or counseling. But we agree with the district court that it's too speculative to conclude from this statement that Brandt "would have administered any test or procedure to [Dr. Carney], let alone one that was designed to reveal a mental or physical impairment." *See Fernandez v. Seaboard Marine LTD.*, 135 F.4th 939,

957 (11th Cir. 2025) ("We have explained that an inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation.") (quotation marks omitted).  It appears Brandt was a psychologist who did not work for Emory but had coached Emory faculty.  Dr. Carney never saw Brandt, and he offers no evidence of the content of a coaching session with him.  His subjective beliefs and speculation about these matters are not sufficient to defeat summary judgment.  *See id.*

For these reasons, the district court did not err in granting summary judgment to Emory.  Even viewing the record in the light most favorable to Dr. Carney, no reasonable jury could conclude that Emory required him to undergo a "medical examination," *see* 42 U.S.C. § 12112(d)(4)(A), as part of its requirement that he participate in leadership coaching.  We affirm.

**AFFIRMED.**